IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC WOLF, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| v. | ) | Judge |
| | ) | |
| QUALITY HUTS, LLC, and MATTHEW AILEY, individually, | ) ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Eric Wolf ("Wolf"), for his Complaint against Defendant Quality Huts, LLC ("QH") and Matthew Ailey ("Ailey") (QH and Ailey, collectively, "Defendants"), states as follows:

**NATURE OF PLAINTIFF'S CLAIMS**

1. This lawsuit involves a breach of an employment agreement and a violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1, *et seq*.

**THE PARTIES**

2. Wolf is a citizen of the State of Arizona.

3. QH is a Delaware limited liability company with its principal place of business in New York, New York.

4. Ailey is a corporate officer of QH.

5. Ailey is a citizen of the State of New York.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 as complete diversity of citizenship between the parties exists as defined in that statute and the amount in controversy exceeds $75,000.

1

7. The employment agreement out of which this dispute arises requires that suits, actions, and other proceedings arising out of the agreement be filed in the state or federal courts of the State of Illinois.

8. Therefore, the parties have consented to personal jurisdiction in this State, and this Court has personal jurisdiction over Defendants.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

**GENERAL ALLEGATIONS**

10. QH owns and operates Pizza Hut restaurants.

11. By mid-September 2017, QH had purchased two Pizza Hut markets (66 restaurants in the Chicago, Illinois/South Bend, Indiana area, and 46 restaurants in Pittsburgh, Pennsylvania).

12. QH was interested in purchasing additional Pizza Hut markets in Indianapolis and Maryland, but Pizza Hut corporate leadership insisted that QH first hire somebody with extensive Pizza Hut experience. To that end, Pizza Hut corporate referred Wolf, who had that experience, to QH.

13. QH principal Matthew Ailey did not have experience in the restaurant business, and QH President George Crane only had prior experience as a Chief Operating Officer of a small steakhouse chain.

14. Wolf had worked for corporate Pizza Hut for 26 years and had experience running 462 corporate locations as the Head Coach for the West Territory. Based on this experience, the Pizza Hut leadership team endorsed Wolf and referred him to Ailey.

15. On or about November 27, 2017, Wolf and QH entered into a written Executive Employment Agreement (the "Agreement").

16. Ailey negotiated the Agreement with Wolf on behalf of QH.

17. Ailey signed the Agreement with Wolf on behalf of QH.

18. Pursuant to the Agreement, QH agreed to employ and pay Wolf for a term of five years.

19. For the services rendered by Wolf, QH agreed to pay Wolf certain compensation, including salary, bonuses, and benefits.

20. The Agreement included a provision stating that the "employment of the Executive hereunder (and this Agreement) may be terminated immediately, or, at the option of the Company upon thirty (30) days' prior written notice to the Executive, without Cause. If the Company terminates this Agreement or the Executive's employment with the Company without Cause as specified in the previous sentence, the Company will pay to the Executive Severance Benefits and Standard Termination Benefits."

21. The Agreement further provided that if QH terminated Wolf's employment for "cause," as defined in the Agreement, QH was obligated to pay Wolf Standard Termination Benefits.

22. Under the Agreement, Severance Benefits included six months of Wolf's base salary (if terminated in the first five years of employment).

23. Under the Agreement, Standard Termination Benefits included earned or accrued benefits, including vacation benefits, and awarded but unpaid bonuses.

24. Shortly after Wolf was hired by QH, QH entered an agreement to purchase the Indianapolis market (43 Pizza Hut restaurants) and the Maryland market (46 Pizza Hut restaurants plus real estate properties including the current Pizza Hut office).

25. QH needed Wolf on board to make these purchases, because Pizza Hut would not have approved those purchases if Wolf had not been at QH.

26. The Indianapolis purchase was complete in mid-May 2018.

27. The Maryland purchase was imminent—and for practical purposes was a "done deal"—by late July 2018.

28. Once it had confirmed that the Indianapolis and Maryland deals were "in the bag," QH and its principals decided to terminate Wolf's employment—without paying him the amounts he was due.

29. On or about July 26, 2018, QH terminated Wolf's employment via a written letter.

30. In an attempt to justify not paying Wolf Severance Benefits due under the Agreement, QH purported to terminate Wolf "for cause," relying on concocted and false characterizations of the work Wolf had performed for QH.

31. All reasons set forth in the termination letter purportedly substantiating Wolf's termination for cause are untrue.

32. And even if the reasons in the termination letter were true, QH never provided Wolf notice and an opportunity to cure the alleged deficiencies, which under Section 4(c) of the Agreement were required before Wolf Could be terminated for cause.

33. As a result, Wolf's termination was without cause, and under the Agreement QH owes Wolf, among other things, Standard Termination Benefits and Severance Benefits.

34. And even if QH had properly fired Wolf for "cause," QH would still owe Wolf his Standard Termination Benefits.

35. Standard Termination Benefits include, among other things, the one and one-half weeks of accrued vacation pay Wolf had earned by his termination date, which had a value of approximately $7,211.54.

36. Standard Termination Benefits also include earned and unpaid bonuses.

37. As of his termination, Wolf earned a pro rata share of his Annual Merit Bonus.

38. Section 3(b) of the Agreement describes general financial criteria that are to be used in calculating Wolf's Annual Merit Bonus.

39. Section 3(b) of the Agreement further states that Wolf and QH's Manager – Ailey – were to establish "target goals" for QH that would be used in calculating Wolf's bonus.

40. However, as a result of problems with QH's accounting firm (whom Wolf had not helped select), QH did not have accurate budgets or financial statements.

41. Without accurate budgets or financial statements, Wolf and Ailey could not set target goals for QH.

42. And even if Wolf and Ailey had been able to set target goals, there would have been no accurate way to measure QH's performance against those goals.

43. As a consequence, QH and Wolf agreed that Wolf would be guaranteed a $250,000 Annual Merit Bonus for 2018. This was reiterated to Wolf several times verbally, and Ailey confirmed this in a March 26, 2018 letter in which he stated, "Mr. Wolf's base salary is $250,000 with a guaranteed minimum bonus of $250,000, equaling a total cash compensation of $500,000 per year."

44. Wolf relied on his agreement with Ailey about the guaranteed bonus; he continued working at QH based on that agreement.

45. Under Sections 4(d) and 3(b) of the Agreement, Wolf is entitled to a prorated amount of that $250,000 Annual Merit Bonus, corresponding to Wolf's work at QH from January 1, 2018 through July 26, 2018.

46. Since Wolf worked at QH for 250 days, the prorated bonus amount due to Wolf is at least $250,000 x 250/365 = $171,232.88.

47. Severance Benefits under the Agreement include six months of base salary.

48. Six months of Wolf's base salary equals $125,000.

## COUNT I
## Breach of Contract

49. Plaintiff incorporates and realleges the prior paragraphs as though set forth herein.

50. The Agreement is an enforceable contract.

51. The Agreement requires QH to pay Severance Benefits to Wolf if he is terminated without cause.

52. The bases upon which QH relied to terminate Wolf's employment are untrue.

53. Instead, QH and its principals terminated Wolf because he was no longer necessary to QH, as QH had acquired, or guaranteed that it would be able to acquire, the Indianapolis and Maryland markets.

54. The Agreement also requires QH to pay Wolf Standard Termination Benefits, even if he is terminated for cause.

55. QH breached the Agreement by terminating Wolf without cause and failing to pay to him, among other things, Severance Benefits and Standard Termination Benefits, including six months of base salary, the monetary value of his earned and accrued vacation benefits, and accrued bonuses.

WHEREFORE, Plaintiff prays for judgment against QH as follows:

A.  All amounts due pursuant to the Agreement;

B.  Attorneys' fees and costs; and

C.  Such other and further relief as this Court deems appropriate and just.

## COUNT II
### Violation of the Illinois Wage Payment and Collection Act – Final Compensation

56. Plaintiff incorporates and realleges the prior paragraphs as though set forth herein.

57. This count arises from the violation of the IWPCA for Defendants' failure and refusal to pay to Wolf "final compensation" as defined in the IWPCA.

58. During Wolf's employment, QH was Wolf's "employer" as defined by the IWPCA. 820 ILCS 115/2.

59. During Wolf's employment, Ailey was Wolf's "employer" as defined by the IWPCA. 820 ILCS 115/2.

60. Ailey participated in the decision to terminate Wolf without cause and refuse to pay Wolf all owed final compensation that Ailey knew Wolf was owed; as a result, Ailey knowingly permitted QH to violate the IWPCA. 820 ILCS 115/13.

61. During his employment, Wolf was an "employee" of QH as defined by the IWPCA. 820 ILCS 115/2.

62. During his employment, Wolf was an "employee" of Ailey as defined by the IWPCA. 820 ILCS 115/2.

63. During approximately the first five months of his employment, Wolf spent approximately 50 percent of his work time working for QH in Illinois.

64. During approximately the last three months of his employment, Wolf spent approximately 25 percent of his work time working for QH in Illinois.

65. As required by the IWPCA, Defendants were required to pay final compensation owed to Wolf pursuant to the Agreement.

66. However, Defendants failed to pay Wolf Severance Benefits and Standard Termination Benefits as expressly required by the Agreement.

67. Wolf reached an agreement with QH, through Ailey, that Defendants would pay him a guaranteed bonus of $250,000 in lieu of the Merit Bonus described in the Agreement because QH's accounting problems prevented an accurate calculation of the Merit Bonus.

68. However, Defendants failed to pay Wolf the prorated amount of his bonus as expressly required by the Agreement.

69. Defendants' failure to pay Wolf for the amounts due under the Agreement violates the IWPCA.

WHEREFORE, Wolf prays for judgment against Defendants as follows:

A. All final compensation owed;

B. Two percent monthly interest as required by 820 ILCS 115/14;

C. Prejudgment interest on back wages in accordance with 815 ILCS 205/2;

D. An award of costs and attorneys' fees pursuant to the 820 ILCS 115/14; and

E. Such other and further relief as this Court deems appropriate and just.

Respectfully submitted,

Dated: October 16, 2018  /s/Douglas M. Werman
One of Plaintiff's Attorneys

Douglas M. Werman (dwerman@flsalaw.com)
Maureen A. Salas (msalas@flsalaw.com)
Sarah J. Arendt (sarendt@flsalaw.com)
Zachary C. Flowerree (zflowerree@flsalaw.com)
Werman Salas P.C.
77 West Washington Street, Suite 1402
Chicago, Illinois 60602
(312) 419-1008

Brad A. Denton
*pro hac vice* application forthcoming
Denton Peterson, P.C.
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

Attorneys for Plaintiff